**SIGNED this 16th day of May, 2011.**

_____

**LEIF M. CLARK**
**UNITED STATES BANKRUPTCY JUDGE**

_____

# United States Bankruptcy Court

### Western District of Texas
### San Antonio Division

| | |
|---|---|
| *In re* | Bankr. Case No. |
| Ronnie J. Pace | 07-52081 |
| *Debtor.* | |
| Randolph N. Osherow<br><br>    *Plaintiff,*<br>v.<br><br>Nelson Hensley &<br>Consolidated Fund Management, L.L.C.<br><br>    *Defendant.* | Adv. No. 09-05080 |

## MEMORANDUM DECISION ON COMPLAINT

### Factual Background

The Debtor ("Ronnie Pace" or "Pace") filed for chapter 7 on August 15, 2007. His wholly-owned company, Chaparral Resources, Inc. ("Chaparral") had previously filed for chapter 11 in November, 2006. That case was later dismissed. Pursuant to a Default Judgment entered by this court on December 13, 2007, the assets of Chaparral are subject to the administration of the chapter 7 trustee for the benefit of creditors in Pace's bankruptcy case. On

1

July 21, 2009, Randolph Osherow (the chapter 7 trustee) (the "Plaintiff") filed an adversary proceeding against Nelson Hensley ("Hensley") and Consolidated Fund Management, LLC. ("CFM") (together, the "Defendants") to recover certain property (the "Austin condo" or "condo") transferred by Chaparral to CFM.  Hensley is the owner of CFM and wholly controls that company's operations. The Plaintiff seeks to avoid the transfer of the condo to CFM and recover the condo, or, in the alternative, its value, for the benefit of Pace's bankruptcy estate. The Plaintiff has alleged facts in support of both an actually fraudulent transfer under the Texas Uniform Fraudulent Transfer Act ("TUFTA") and a constructively fraudulent transfer under the TUFTA and section 548(a)(2) of the Bankruptcy Code.  The Plaintiff also seeks damages for breach of fiduciary duty, alleging that Hensley violated Rule 1.08 of the Texas Disciplinary Rules of Professional Conduct for attorneys by entering into this transaction with Pace in the first place. Finally, the Plaintiff seeks attorneys' fees and exemplary damages.  The Defendants deny that the transfer is avoidable or that Hensley is personally liable to the Plaintiff as a result of the transfer. They maintain that the buyer, CFM, paid fair and adequate consideration and reasonably equivalent value for the condo in good faith.  They also contend that they have provided proof of payment and that Pace and Chaparral consented to the transfer at issue in writing.  Furthermore, assert the Defendants, CFM made improvements to the unit and payments thereon, including taxes, assessments and maintenance fees. The Defendants state that if the transfer is avoided, CFM should recover all monies paid for the condo and expended on taxes, maintenance, assessments and improvements as well as attorneys' fees.

The trial of this matter was held on February 18 and 23, 2011. The following constitutes this court's findings of fact and conclusions and law. Pace founded Chaparral in 1977 and has always been the 100% shareholder and president of the company. Chaparral was a 50% owner of an entity called DFIC. In 2000, Chaparral and Brandon bought out the third owner of DFIC. Simultaneously with this buy-out, Chaparral and Brandon sold 100% of DFIC's stock to DFIC Holdings, an ESOP established for the benefit of the employees of DFIC and Brandon Construction Company. Brandon and Chaparral each retained a 15% interest in the stock of the ESOP (DFIC Holdings). This stock was subject to a pledge, as security, to the bought-out former owner of DFIC. Chaparral and Brandon each took a $1.4 million note from DFIC Holdings in exchange for this stock transfer. In July, 2004, DFIC Holdings stopped making payments on the note to Chaparral and Pace was effectively pushed out of the business. In 2005 the bought-out owner of the former DFIC initiated a lawsuit against Pace and Chaparral in connection with Chaparral's and/or Brandon's failure to make payments to her under the buy-out agreement. On the same day that this suit was filed against Pace and Chaparral, Pace and Chaparral filed a suit against Brandon and the bought-out owner of DFIC. The suit against Pace and Chaparral ultimately resulted in a judgment being entered in May, 2007, against Pace and Chaparral for close to $1,000,000. This judgment has never been paid. In April, 2005, while the litigation

against Chaparral and Pace was pending, Brandon abandoned the DFIC property. A receiver was appointed to take control of the property. Shortly thereafter, Pace re-entered the property and continued DFIC's operations under the name DFIC, Inc. The receiver had leased the DFIC property to DFIC Holdings, which in turn leased the property to Pace's newly-formed company, DFIC, Inc. DFIC, Inc. ceased operating in the Spring of 2006 when the company ran out of work and Pace defaulted on the lease. The $1.4 million note to Chaparral from DFIC Holdings thus became uncollectible.

Durrins Ltd. owned seven dry cleaning operations called Durrins. Pace owned 100% of the stock of Durrins, Ltd. Sometime in the Fall of 2006 Pace defaulted on a note to Durrins and Whatley, the owner of the property upon which Durrins operated, brought suit against Pace and Chaparral to collect on that note.

Pace and Hensley are close friends. Hensley is the managing member of CFM and controls all of that company's operations. Hensley represented Pace, individually, from 1983 through 1985 and again in 2005, 2006 and perhaps 2007. Hensley also represented Chaparral, the company through which Pace ran most of his other business operations, beginning in 2005. In July, 2005, Pace, faced with financial difficulties concerning both Durrins and DFIC, Inc., began to borrow money from Hensley and/or CFM to allow Pace to continue his various business operations. Hensley and Pace claimed that they began discussing transferring ownership of the Austin condo from Chaparral to CFM in November, 2005, with Hensley testifying that he told Pace he was not going to loan Pace any more money for Pace's business operations unless Hensley got something in return. However, it was not until March 10, 2006, that Pace actually arranged for Chaparral to transfer the Austin condo by special warranty deed to CFM. (*See* Ex. 25.) Hensley stated that the special warranty deed had been prepared by his office. Other than this deed, no evidence of a sale from Chaparral to CFM was presented at the hearing. Hensley maintained that, in total, CFM paid around $122,500 for the condo by way of a series of separate loans or advances to Chaparral or other Pace-related entities beginning as early as October, 2005. (*See* Ex. 5.) However, all the evidence of this purported "consideration" was ex post, and no contemporaneous documentation of the terms of a sale were offered. To the contrary, Hensley and Pace both maintained they arrived at the "price" in November, 2005, based on the Travis County tax appraisal value on the condo of just over $121,000. However, the 2005 Travis County tax appraisal for the condo was only $97,236. (*See* Ex. 26.) The county did not value the condo at $121,000 (plus) until the Spring of 2006, after November, 2005—the time that both Hensley and Pace claimed they made their deal. The testimony regarding the purported agreed purchase price was thus not credible. Pace never received a lump sum payment of the purported $122,500 purchase price. Pace and Hensley maintained that the "purchase price" was paid in several separate transactions over the course of several months, without interest, and without a stated

3

maturity date. This entire description of the reason for the transfer simply did not hang together and the court finds that it is not the correct explanation for the transfer.

Hensley proposed that the purpose of the various loan transactions between Hensley/CFM and Pace/Chaparral was summarized in Exhibit 5. Some of the transactions purportedly related directly to the condo transfer while others constituted loans from Hensley/CFM to Pace (and his various companies) to allow Pace to continue his business operations. The transfers that purportedly related to the condo included the following: On October 7, 2005, Hensley/CFM executed a check for $15,000 made out to Chaparral. (*See* Ex. 9.) Hensley and Pace both said that this check was a loan that Pace used to pay the security deposit for Pace/DFIC's lease of certain property from the receiver. (*See* Ex. 105.) On November 22, 2005, Hensley/CFM executed a check for $10,000 made out to Chaparral. Exhibit 103 is a ledger entry identifying the $10,000 transfer as a loan to Chaparral. Pace testified, however, that this check went directly to the general manager of Durrins. The next transaction took place on February 15, 2006. This transaction was for $15,000. The money did not come from CFM and did not go to Chaparral; rather it came from Hensley's general cash management account (which Hensley stated was co-mingled with CFM funds) and went directly to DFIC, Inc. to pay that company's operating expenses. (*See* Ex. 12.) The next transaction was a March 6, 2006, transfer of $20,000 from Hensley's general cash management account directly to Durrins. (*See* Ex. 15.) Then, on March 10, 2006, Hensley transferred $50,000 from Hensley's general cash management account to Durrins. (*See* Ex. 16.) Hensley stated that this transfer was used by Durrins to pay several months of rent owed by Durrins. The final transaction was an April 27, 2006, transfer of $12,500 from CFM to Ronnie Pace. The memo line on this check describes the transfer as a loan. (*See* Ex. 23.) Hensley testified that this money constituted the final payment on the condo. He stated that these funds were also used to pay certain obligations of Durrins. At the time Hensley/CFM made the transfers described above, Pace and Hensley knew and intended that the transferred funds would be used by Pace to fund the operations of Durrins and DFIC.

The above-described transactions add up to a total of $122,500. While all of the transfers were directed to (and used to pay the operating expenses of) entities other than Pace or Chaparral (as Pace testified), Hensley viewed Pace and Chaparral as the ultimate beneficiaries of the transfers. There is some confusion surrounding a July 19, 2008, payment of $42,800 from CFM to Managed Mortgage Investment Fund. At the hearing Pace maintained that this transaction did not relate to the condo, and was used to pay off a loan to Durrins. In his deposition, however, Pace stated that this transaction was part of the purchase price for the condo.

Other than the oral testimony of Hensley and Pace, no other corroborating evidence was offered to tie these various transactions to the condo transfer. The purported "price" for the condo transfer appears to have been set after the fact by Hensley and Pace after litigation was

threatened. No contemporaneous writings in any way tying the loans to the condo transfer were offered -- no letters, no memos, no handwritten notes, no emails. The lack of corroboration is strong evidence that undercuts the credibility of the self-serving, after-the-fact testimony of Pace and Hensley.

Hensley further testified that by November, 2005, Chaparral owed Hensley legal fees. In prior litigation brought against Pace, Hensley had testified that part of the consideration for the condo consisted of a $10,000 - $15,000 credit against attorneys' fees owed. Hensley did not present any documentation to support a finding that part of the consideration for the condo consisted of a credit against attorneys' fees owed by Chaparral. Hensley also did not present any evidence that Chaparral owed Hensley any attorneys' fees at the time of the transfer of the condo, and the court finds that in fact no fees were owed.

On the statement of financial affairs filed in Chaparral's bankruptcy case, the condo was listed as having been sold to Hensley in order to compensate Hensley for outstanding attorneys' fees owed by Pace or Chapparal. Pace maintained at trial that this statement resulted from an error in filling out the SOFA on the part of Chaparral's bankruptcy attorney, Barbara Rogers; Pace stated that Chaparral's SOFA should have listed the condo as sold for consideration. He maintained that he had signed blank schedules and statements which were later filled in by Ms. Rogers, but Ms. Rogers' time entries reflect that Pace reviewed all changes and additions to the schedules and statements before they were filed. Additionally, Pace's testimony is undercut by the deposition testimony of Ms. Rogers, who laid out the following sequence of events: Ms. Rogers first prepared Chaparral's SOFA on January 2, 2007. She filed an amended SOFA in February, 2007. Pace approved all of the information contained therein, including the provision that listed the condo as having been transferred as an offset against attorneys' fees, and signed the SOFA as prepared by Ms. Rogers. Pace testified that these schedules and statements were true and correct at the subsequent 341 meeting of creditors. At Pace's Rule 2004 examination in March, 2007, Ms. Rogers learned for the first time that the condo might not after all have been transferred as payment for past due attorneys' fees; Pace stated that the condo had actually been transferred to CFM as repayment of certain loans. After attempting to get clarification from Pace regarding the reason for the transfer of the condo, and after receiving a series of checks from Hensley purporting to show the payments made as consideration for the condo (none of which were actually made out to Chaparral), Ms. Rogers prepared a disclosure statement (and an amended disclosure statement in July, 2007) reflecting that the transfer of the condo had been for attorneys' fees owed to and funds loaned by Hensley. Ms. Rogers never saw a bill reflecting any attorneys' fees owed by Chaparral. (*See generally*, Rogers Dep., pp. 80-87.) The court cannot conceive of any reason why Ms. Rogers would put information into Chaparral's SOFA that did not reflect the information she had gained directly from Pace. Accordingly, the court will credit

her deposition testimony and time entries over the unsupported testimony of Pace. The fact that an entirely different (though equally unsupported) explanation for the transfer of the condo was offered in the Chaparral bankruptcy documents further undercut the credibility of Pace's explanations about the transfer of the condo.

After the transfer of the condo to CFM in March, 2006, Hensley did not notify the property management company that ownership of the condo had been transferred to CFM (although CFM was listed as the owner on a listing agreement with the property management company executed in late 2007). Pace continued to serve as the contact person for the management company and continued receiving the rental payments (less the HOA dues) from the management company. Chaparral continued to pay the maintenance costs and utilities for the condo after the March, 2006, transfer until the property was vandalized in 2007. (*See* Ex. 79.). Hensley testified that as compensation for collecting the rent, Hensley let Pace keep the rental payments. Hensley also said that CFM paid the taxes on the condo for 2005, 2006, 2007 and 2008, that CFM paid for various repairs and replacement of appliances and carpet, that CFM paid part of a special assessment, and that CFM paid the HOA dues on the condo for 18 months. These payments by CFM totaled $13,846.91. Nonetheless, it was not until February 25, 2010, after this adversary proceeding had already been filed, that CFM notified the management company of its ownership of the condo and requested that the management company send all future correspondence to CFM. (*See* Ex. 28.). Until then, to the rest of the world (and to the property management company), the condo was still owned by Chaparral.

Hensley represented both Pace and Chaparral at the time of the transfer of the condo from Chaparral to CFM. However, Hensley never told Pace to seek other counsel in connection with this transaction. Aside from signing the deed itself, Pace never signed any document consenting in writing to the sale of the condo to his attorney. Neither Pace nor Hensley was able to produce such a document. In November, 2006, Chaparral filed for chapter 11 in the Southern District of Texas. Hensley was retained as special counsel for Chaparral to pursue a fraudulent transfer action on behalf of Chaparral in connection with the above-mentioned DFIC litigation. In connection with this retention Hensley stated that he did not represent any adverse interest of the debtor. He did not disclose CFM's ownership of the condo. Hensley stated that he was not a creditor of Chaparral at that time because he had waived any claim he might have had against Chaparral. Hensley did not file a fee application in connection with his retention as special counsel in Chaparral's bankruptcy case.

Conflicting testimony was presented regarding the financial status of Pace and Chaparral at the time of the condo transfer. The schedules filed in Pace's bankruptcy case in November, 2006, showed that, when Pace filed for chapter 7 protection, he had assets of $163,904.91 and liabilities of $1,483,780.68. (*See* Ex. 58.) Chaparral's schedules, as amended in February, 2007,

showed that at the time of Chaparral's chapter 11 filing Chaparral had assets of $1,694,303 and liabilities of $1,730,263.47. (*See* Exs. 38 & 44.) The accounts receivable held by DFIC Holdings, Pace and Durrins were deemed to be uncollectible, and were deducted from Chaparral's total assets. Based on these schedules, the total combined assets of Chaparral and Pace approximately 9 months after the transfer of the condo amounted to $1,858,207.91. The total liabilities of Pace and Chaparral at that time amounted to $3,214.044.15. Although Pace initially testified that his financial condition and that of Chaparral did not change from the date of the transfer of the condo until Pace filed for bankruptcy (he testified that his balance sheet did not change during this time), Pace testified on cross-examination that, in fact, the value of the DFIC entities and Durrins substantially declined during the 9 month period from March, 2006, until November, 2006. He stated that at the time of the transfer his assets totaled approximately $4.5 million, but that after he abandoned DFIC later in March, the $1.2 million note from DFIC Holdings became worth nothing. Furthermore, the accounts receivable held by DFIC also became uncollectible at that time. Pace testified that Durrins also began to lose money after the transfer of the condo, and that by the time Pace filed for bankruptcy Durrins was worth nothing.

In total, Pace stated that he believed his assets declined in value by approximately $3 million during the time after the transfer of the condo until his bankruptcy filing. Although Pace testified that these losses were unexpected (he continued borrowing money to keep DFIC and Durrins operational), the Plaintiff maintained that the DFIC accounts receivable were clearly uncollectible at the time of the transfer, and thus Pace's estimated value of his assets at that time was over-stated. The Plaintiff also argued that DFIC and Durrins had been losing money before the transfer, and were unable to pay their debts at the time of the transfer, thus evidencing their dire financial condition. The Plaintiff maintained that Chaparral also did not have sufficient funds to maintain the operations of DFIC and Durrins at the time of the transfer. Although Chaparral did have $300,000 in a money market account, Wells Fargo had a lien on that account. In short, Chaparral had to borrow from CFM and Hensley to fund the dying operations of DFIC and Durrins. The court finds that the valuation of both Durrins and DFIC (as well as the receivables owed to DFIC Holdings) offered by Pace was substantially and unjustifiably inflated, and that in fact both Pace and Chaparral were insolvent at the time of the transfer (or were rendered insolvent by the transfer).

### Discussion

1. <u>Fraudulent Conveyance under the TUFTA</u>

The Plaintiff maintains that the facts presented at the hearing and summarized above illustrate that the March, 2006, transfer of the condo from Chaparral to CFM constituted both an

actually fraudulent transfer and a constructively fraudulent transfer under the TUFTA.[1] "Section 544 of the Bankruptcy Code allows the trustee to step into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance laws and confers on the trustee the status of a hypothetical creditor or bona fide purchaser as of the commencement of the case."[2] *Anderson v. Mega Sys., L.L.C. (In re Mega Sys., L.L.C.)*, 2007 Bankr. LEXIS 1957, at *24 (Bankr. E.D. Tex. June 4, 2007) (citation omitted); *see also Asarco LLC v. Americas Mining Corp.*, 404 B.R. 150, 156 (S.D. Tex. 2009) ("Trustees and debtors in possession use § 544(b) as a conduit to assert state-law-based fraudulent-transfer claims in bankruptcy"); *Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 601 (B.A.P. 8th Cir. 2003) ("Section 544(b) of the Bankruptcy Code gives the bankruptcy trustee whatever avoiding powers an unsecured creditor with an allowable claim might have under applicable state or federal law."). "To prevail under § 544(b), the trustee must first establish that at the time of the transaction there was, in fact, a creditor in existence who was holding an unsecured claim that is allowable under 11 U.S.C. § 502." *Lyon v. Eiseman (In re Forbes)*, 372 B.R. 321, 335 (B.A.P. 6th Cir. 2007). Neither party disputes that Pace had unsecured creditors with allowable claims at the time of the transfer of the condo, including, most notably, Linda Lashley (the bought-out former owner of DFIC). The applicable state law in this case is the TUFTA—specifically, sections 24.005 and 24.006 of the Texas Business and Commerce Code.

Under the TUFTA, fraudulent transfers are divided into two types: actual fraudulent transfers, § 24.005(a)(1), and constructive fraudulent transfers, § 24.005(a)(2) and § 24.006. Section 24.006 differs from section 24.005(a)(2) in that it is available only to creditors whose claims arose before the transfer took place, while section 24.005(a)(2) is available to both present and future creditors. However, Linda Lashley, the actual creditor here needed to give the Trustee standing to bring this TUFTA action, *see* 11 U.S.C. § 544(b), was a present creditor, so the Trustee was permitted to sue under either section.

Regarding the Plaintiff's claim of actual fraud, section 24.005(a)(1) of the Texas Business & Commerce Code addresses liability for actually fraudulent transfers. That section provides:

---

[1] Because the court addresses the Plaintiff's allegations that the transfer of the condo was a sham in the court's discussion of the Plaintiff's fraudulent conveyance claims, the court will not separately address the Plaintiff's request for a declaratory judgment. Additionally, the court recognizes that the Plaintiff also brought a constructive fraudulent conveyance claim under section 548(a)(1)(B) of the Bankruptcy Code. But because the court finds the transfer avoidable under state law, the court need not address section 548.

[2] Section 544 of the Bankruptcy Code provides:

> The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; …

Tex. Bus. & Com. Code, § 24.005. Under this section of the TUFTA, the creditor's claim need not have arisen before the transfer; to maintain an action under section 24.005(a) "a creditor's claim must have arisen before *or within a reasonable time after* the transfer." *Williams v. Performance Diesel*, 2002 Tex. App. LEXIS 2735, at *7 (Tex. App.—Houston [14th Dist.] Apr. 18, 2002) (emphasis added).

Due to the difficulty of proving, with direct evidence, actual intent to defraud, the TUFTA allows a plaintiff to plead badges of fraud, which provide circumstantial evidence of such actual intent. The Fifth Circuit discussed this statute in *Soza v. Hill (In re Soza)*, 542 F.3d 1060 (5th Cir. 2008), noting that section 24.005(b) of the TUFTA provides that,

in determining actual intent under [§ 24.005(a)(1)], consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*In re Soza*, 542 F.3d at 1066 n.5. "The intent that is required [under section 24.005(a)(1)] is not the same intent that is necessary to support an action for fraud. Rather, the intent required under TUFTA is simply the intent to hinder, delay or defraud a creditor by putting assets beyond that creditor's reach." *Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.),* 421 B.R. 251, 299 (Bankr. W.D. Tex. 2009) (internal citation omitted.)

State law governs the burden of proof on the Plaintiff's fraudulent transfer claims under section 544(b). *Savage & Assocs. v. Mandl (In re Teligent Inc.)*, 380 B.R. 324, 332 (Bankr. S.D.N.Y. 2008). Under section 24.005, "[t]he Trustee bears the burden of proof to show, by a preponderance of evidence, that the transfers in question were made by the Debtor with the actual intent to hinder, delay or defraud any creditor of the Debtor." *Ingalls*, 421 B.R. at 299. An issue arose at the trial regarding Hensley's intent to defraud. Hensley's intent, however, is irrelevant to the question of whether the transfer is avoidable under section 24.005(a)(1). *See SEC, et al. v. Resource Development Int'l LLC, et al.*, 487 F.3d 295, 301 (5th Cir. 2007) ("'[T]he transferees' knowing participation is irrelevant under the statute' for purposes of establishing the premise of (as opposed to liability for) a fraudulent transfer."). Section 24.005 "requires only a finding of fraudulent intent on the part of the 'debtor.'" *Id*.

After considering the factors listed above in light of the facts presented at trial the court finds that the March 10, 2006, transfer of the condo from Chaparral to CFM constituted a transfer made with the actual intent to hinder, delay or defraud Pace's/Chaparral's creditors. While the transfer was not strictly to an insider as that term is defined by the Bankruptcy Code,[3] the transfer was to a close, long-time friend and attorney of Pace. Additionally, the evidence showed that Pace retained substantial control of the property after the transfer to CFM. Pace collected the rent and was the only contact person for the management company until February, 2010. Hensley asserted formal control ove the condo then, but by that time this litigation was already on file. Furthermore, Chaparral continued to pay maintenance fees and utilities for the condo until sometime in 2007, when the property was vandalized. At the time of the transfer Pace and Chaparral were also involved in a significant lawsuit that had been brought by the bought-out former owner of DFIC. Additionally, as discussed in more detail below in connection with the Plaintiff's constructive fraudulent transfer claim, Pace and Chaparral did not receive reasonably

---

[3]*See* 11 U.S.C. § 101(31).

equivalent value for the condo. And finally, while there could be a question regarding whether Pace was actually insolvent at the time of the transfer, there is no question that he became insolvent shortly thereafter.[4]

In further support of its actual fraud claim, the Plaintiff asserted that this court had already concluded that the transfer of the condo amounted to a sham transaction. The Plaintiff cited this court's finding in another adversary proceeding in this case (the "*Whatley* case") wherein the court found that, "[a]lthough the legal title to the property [the condo] was transferred to Consolidated Fund Management, LLC, beneficial ownership, to all intents and purposes, remained with Pace, who continued to enjoy the benefit of rents, continued to pay the obligations associated with maintenance and utilities, and the like, and, in all respects, acted like the owner of the property, save one respect: his name wasn't on the deed." (Tr., p. 6, *Chester B. Whatley & Alice Faye Whatley v. Ronnie Jhue Pace*, No. 08-05011).

This court cannot, however, give preclusive effect to this ruling under a theory of *res judicata* or collateral estoppel for the simple reason that Hensley and CFM were not parties (or in privity with a party) to that litigation. "Collateral estoppel applies when, in the initial litigation, (1) the issue at stake in the pending litigation is the same, (2) the issue was actually litigated, and (3) the determination of the issue in the initial litigation was a necessary part of the judgment." *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip.*, Inc., 434 F.3d 320, 323 (5th Cir. 2005). "Collateral estoppel bars the relitigation of an issue of ultimate fact by the party against whom the issue has been determined by a valid and final judgment." *Hibernia Nat'l Bank v. United States*, 740 F.2d 382, 387 (5th Cir. 1984). While mutuality of parties is not required, collateral estoppel can only be applied against parties who have had a prior full and fair opportunity to litigate their claims. *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 338 (5th Cir. 1982) (explaining *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 58 L. Ed. 2d 552, 99 S. Ct. 645 (1979)). This requirement is satisfied if the party being estopped was in privity with a party to the prior litigation. *See Dow Agrosciences, LLC v. Bates*, No. 5:01-CV-331-C, 2003 U.S. Dist. LEXIS 20389, at *61-62 (N.D. Tex. Oct. 14, 2003). ("Literal identity of the parties is not required as part of the *res judicata* and collateral estoppel analysis so long as the party against whom enforcement is sought was in privity with a party involved in the initial decision.") Here, the Defendants were not parties to the prior suit wherein the nature of Pace's ownership of the condo was addressed. The Fifth Circuit has stated that

---

[4] As previously noted by the bankruptcy court for the Western District of Texas: "The presence of many badges of fraud 'will always make out a strong case of fraud.' Proof of four to five badges of fraud has been found sufficient in several reported cases." *Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.)*, 421 B.R. 251, 299-300 (Bankr. W.D. Tex. 2009) (citing Texas fraudulent transfer cases; internal citations omitted).

[c]omplete identity of parties in the two suits is not required. A preclusion defense, subject to certain conditions, may be invoked by a non-party against a party to the prior suit, and, in limited instances, against a non-party by a party to the prior suit. *See, e.g., Parklane Hosiery v. Shore*, 439 U.S. 322, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979) … The imposition of a preclusive bar against a non-party to the original adjudication is limited for obvious reasons: a non-party has had no day in court. Nonetheless, there is a set of exceptions which permit use of a preclusive bar against a non-party.

*Terrell v. De Conna*, 877 F.2d 1267, 1270 (5th Cir. 1989). The court went on to list the three exceptions to the mutuality requirement:

The general federal rule regarding the use of issue or claim preclusion against a non-party states that, [f]irst, a nonparty who has succeeded to a party's interest in property is bound by any prior judgments against that party. . . . Second, a nonparty who controlled the original suit will be bound by the resulting judgment. . . . Third, federal courts will bind a nonparty whose interests were represented adequately by a party in the original suit.

*Id*.

Here, none of these exceptions apply. First, while CFM may have succeeded to Pace's interest in the condo, the transfer occurred *prior to* the judgment in the *Whatley* case. The transfer occurred on March 10, 2006 and the *Whatley* case did not even begin until January, 2008. Second, it was never shown or even suggested that the Defendants controlled the litigation in the *Whatley* case. Third, "[u]nder the rubric of adequate representation, federal courts have consistently held that a non-party is bound if he authorized a party in the prior suit to represent his interests, or if he was represented as a member of a class or association in the original litigation." *Meza v. General Battery Corp.*, 908 F.2d 1262, 1266-67 (5th Cir. 1990). The Fifth Circuit has also found adequate representation between a party and a non-party "where a party to the original suit is 'so closely aligned to the non-party's interests as to be his virtual representative.'" *Id.* (quoting *Aerojet-General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.)). In *Gummow v. Splined Tools Corp.*, the court stated that "[i]n order to establish virtual representation for purposes of *res judicata* or collateral estoppel, there must be an express or implied relationship in which the parties to the first suit are accountable to non-parties involved in a subsequent action raising identical issues." No. 3-03-CV-1428-L, 2005 U.S. Dist. LEXIS 10947, at *11 (N.D. Tex. 2005); *see also Marine Office of America Corp. v. Vulcan MV*, 921 F. Supp. 368, 373 (E.D. La. 1996) (application of *res judicata* or collateral estoppel using the theory or virtual representation "requires more than just a 'parallel interest' to show virtual

representation"); *Meza*, 908 F.2d at 1264 (finding no virtual representation where party in prior action had no contractual duty or statutory obligation to represent nonparty). None of the above examples of "adequate representation" are present here. Accordingly, the court did not give any preclusive effect to its findings in the *Whatley* case regarding Pace's ownership of the condo.

Nonetheless, for the reasons noted above, the court concludes that the transfer did constitute an actual fraudulent transfer under section 24.005(a)(1) of the TUFTA. The evidence at trial confirmed the observation made in the *Whatley* adversary. Pace arranged for Chaparral to transfer the condo at a time when Pace and his companies were in serious financial straits, and were involved in litigation in which serious damages were being sought. A sufficient number of the badges of fraud are presented by the evidence -- Pace retaining actual control of the condo, Pace continuing to receive the economic benefits from the condo, Pace transferring the condo at a time when he was involved in litigation, Pace using the alleged "proceeds" not for Chaparral or even for Pace but for third party companies in a fashion that tended to disguise his actual intentions, Chaparral had significant indebtedness (and so did Pace), and there was no adequate showing that any consideration was actually given for the condo transfer. If Hensley is considered an insider (and the nature of their relationship strongly supports that conclusion), then yet another badge is present. These factual findings support the conclusion that Pace and Chaparral acted with actual intent to hinder, delay or defraud creditors under section 24.005(a) (1).

The Plaintiff also argued that the transfer of the condo constituted a constructively fraudulent transfer under section 24.006(a) of the TUFTA. Section 24.006(a) states:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Tex. Bus. & Com. Code, § 24.006(a). To maintain an action under section 24.006 of the TUFTA, as opposed to section 24.005(a), "a creditor's claim must have arisen before the transfer in question was made." *Williams*, 2002 Tex. App. LEXIS 2735, at *7. As already noted, that condition has been satisfied in this case.

While the parties did not seriously dispute that $122,500 may have been a reasonable price to pay for the condo at the time of the transfer, the question here is whether Pace/Chaparral actually *received* that "reasonably equivalent value" by virtue of the numerous transfers to other Pace-related entities. As articulated by the district court for the Southern District of Texas,

'Reasonably equivalent value' includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets at an arm's length transaction.' … Value is determined as of the date of the transfer in question. In determining value, a court should examine all aspects of a transaction and both direct and indirect burdens to the debtor. The determination is made from the creditor's point of view; the issue is whether from the creditor's standpoint, the estate lost value. Courts examine all the circumstances surrounding a transaction, looking to whether there is a reasonable and fair proportion between what the debtor surrendered and what the debtor received in return … 'the proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors.'

*Smith v. Am. Founders Fin. Corp.*, 2006 U.S. Dist. LEXIS 74865, at *25-26 (S.D. Tex. Sept. 29, 2006) (internal citations omitted). The Plaintiff bore the burden of proving the elements of section 24.006 (i.e. that the transfer was not for "reasonably equivalent value" and that debtor was already insolvent or became insolvent as a result of the transfer). *See Tow v. Pajooh (In re CRCGP LLC)*, 2008 Bankr. LEXIS 4236, at *27 (Bankr. S.D. Tex. Aug. 28, 2008) (under section 24.006 "[i]t is [the trustee's] burden to show that [debtor] was insolvent at the time of the transfers or was made insolvent as a result of the transfers"); *Ingalls*, 421 B.R. at 300 ("To prevail specifically on his § 24.005(a)(2) and § 24.006(a) TUFTA claims, the Trustee must demonstrate that the Debtor did not receive "reasonably equivalent value" in exchange for the transferred assets").

The court has already found that the evidence failed to connect the transfer of the condo with the various loans and advances made to Pace and his various businesses. On that basis alone, the court is justified in concluding that no reasonably equivalent value was given to either Chaparral or to Pace for the transfer of the condo, satisfying that element of section 24.006(a). Yet even if those transfers were somehow to be linked to the transfer of the condo, the court would still conclude that no reasonably equivalent value was received by the transferor. Instead the majority of loans and advances went to entities other than the transferor.

The Fifth Circuit case *SEC v. Resource Development International, LLC*, 487 F.3d 295 (5th Cir. 2007), is instructive on the issue of determining reasonably equivalent value when the consideration for an alleged fraudulent transfer goes to an entity other than the transferor. In that case, after the target of an SEC investigation had his assets frozen, he entered into an agreement with a close friend and long-time associate whereby the friend arranged for the friend's company to transfer funds to the target's attorneys (to cover legal fees) in exchange for immediate reimbursement. *Id.* at 298. Immediately after the friend paid the target's attorneys, the friend's company received a wire transfer from a company that later turned out to be part of the target's

14

Ponzi scheme operation. *Id*. at 298-99. A receiver was eventually appointed for the company that made the wire transfer to the friend, and the receiver filed a fraudulent transfer suit against the friend and the friend's company, alleging joint and several liability. *Id*. at 299. In examining "reasonably equivalent value" under section 24.006 of the TUFTA, the court noted that "[t]he primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved." *Id*. at 301 (internal quotations and citation omitted). The defendants argued that the transferor company "had received value in exchange for its $60,000 transfer to [the friend's company] because the Defendants made a payment of the same amount to [the target's] lawyers for legal fees." *Id*. The court stated,

> '[c]onsideration having no utility from a creditor's viewpoint does not satisfy the
> statutory definition.' Here, [the transferor company's] net worth was diminished
> by the $60,000 payment to [the friend's company] and its defrauded creditors
> received no benefit from funding the legal defense of one of the major organizers
> of this fraudulent scheme.

*Id*. (internal citations omitted). The court concluded that the transferor company had not received "reasonably equivalent value" for the wire transfer to the friend's company, ultimately affirming the lower court's finding that the transfer had been both actually and constructively fraudulent under the TUFTA. *Id*.

In short, "[a] payment made solely for the benefit of a third party, such as a payment to satisfy a third party's debt, does not furnish reasonably-equivalent value to the debtor." *In re Whaley*, 229 B.R. 767, 775 (Bankr. D. Minn. 1999) (citing *In re Bargfrede*, 117 F.3d 1078, 1080 (8th Cir. 1997)); *see also Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 666 (S.D. Tex. 2007) ("Generally, a transferor receives less than reasonably equivalent value when it transfers property in exchange for consideration that passes to a third party."); *In re Art Unlimited,* 356 B.R. 700, 2006 WL 3512133 (Bankr. E.D. Wis. 2006) (holding that debtor did not receive reasonably equivalent value in exchange for the sale of its assets where the proceeds went to pay the debts of its principal rather than the debtor's trade creditors); *In re Newtowne,* 157 B.R. 374, 379 (Bankr. S.D. Ohio 1993) (debtor's payment of affiliated company's debt, significantly diminishing debtor's net worth, could be avoided as a fraudulent transfer). Courts have recognized that reasonably equivalent value may be found in transfers involving third parties if the debtor received some indirect benefit from the transfer. *Smith*, 365 B.R. at 666-67. But such benefits must be "fairly concrete." *Id*. In *Smith* the court stated that "[w]hen the consideration for a transfer passes to the parent corporation of a debtor-subsidiary that is making the transfer, as in this case, the benefit to the debtor may be presumed to be nominal, absent proof of specific benefit to the debtor itself." *Id*. at 667. The court went on to state,

> The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the commercial value of the assets transferred. Thus, when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received.

*Id*. Finally, the court listed the three common scenarios where a debtor might be found to have received "reasonably equivalent value" by discharging the debts of a third party:

> The first is when the debtor's payment of a third party's debt results in a discharge of the debtor's own debt to the third party. But if no corresponding obligation of the transferor is discharged, courts have not hesitated to avoid transfers made to satisfy a third party's debt. The second scenario is when the debtor and the third party are so 'related or situated that they share an identity of interests because what benefits one will . . . benefit the other to some degree.' Finally, when a debtor 'enjoys the benefits of the goods or services it bought for its principal, the transfer of money for those goods or services may not be avoided.'

*Id*. Here, only the second scenario could possibly apply. Hensley forcefully argued that the payments made to DFIC and Durrins were made *on behalf of* Pace, but the evidence presented at the trial clearly showed that Pace was not the 100% owner of any of the DFIC entities. Accordingly, the transfers to those entities necessarily did not provide "reasonably equivalent value" to Pace or Chaparral. Even giving Hensley the benefit of the doubt regarding the October 7, 2005, check for $15,000 made out to Chaparral (that both Hensley and Pace testified ultimately went to DFIC), the other $15,000 transfer (on February 15, 2006) that went directly to DFIC cannot be said to have had any utility from the viewpoint of Pace's creditors. *See Resource Dev. Int'l*, 487 F.3d at 299. None of the evidence presented at the trial showed that Pace or Chaparral in any way benefitted from passing on the funds received from Hensley to DFIC. *See Smith*, 365 B.R. at 667. To the contrary, the evidence showed that Pace abandoned DFIC only weeks after the transfer of the condo because the company had no work.

Pace did own 100% of Durrins, Ltd. at the time of the transfer. But these transfers cannot be said to have benefitted either Pace or Chaparral because Durrins, at the time of the transfer of the condo in March, 2006, appears to have been insolvent. Durrins was unable to pay its operating expenses at the time of the transfer and had been relying on money borrowed from Hensley since the Fall of 2005. Transfers to a debtor's wholly-owned but insolvent company do not furnish "reasonably equivalent value." *See In re First City Bancorporation*, 1995 Bankr. LEXIS 1683, at *35 n. 9 (Bankr. N.D. Tex. May 11, 1995) ("While a transfer to a wholly-owned solvent subsidiary is often for reasonably equivalent value, because the value of the parent's

stock interest in the subsidiary may be correspondingly increased, that is not the case when the subsidiary is hopelessly insolvent, because the value of those shares is zero both before and after the transfer."). In sum, the transfer of the condo in exchange for funds used to pay the obligations of Durrins and DFIC did not preserve Pace's net worth or provide any benefit to the debtor and thus was not for "reasonably equivalent value."

The second prong of a constructive fraudulent transfer claim requires that the Plaintiff establish the debtor's insolvency at the time of the transfer. *Tow v. Pajooh (In re CRCGP LLC)*, 2008 Bankr. LEXIS 4236, at *27 (Bankr. S.D. Tex. Aug. 28, 2008). Section 101(32) of the Bankruptcy Code defines the term "insolvent" as:

(A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of--

    (i)    property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

    (ii)    property that may be exempted from property of the estate under section 522 …

11 U.S.C. § 101(32). The TUFTA defines "insolvency" as follows:

(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

(b) A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent.

***

(d) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.

(e) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

Tex. Bus. & Com. Code § 24.003. Thus, "[u]nder both Texas law and the Bankruptcy Code, a debtor is insolvent if the sum of its liabilities is greater than the sum of its assets at a fair

valuation." *Indiana Bell Telephone Co., Inc. v. Lovelady (In re Lovelady)*, 2007 WL 4754174 (W.D. Tex. Mar. 19, 2007).

Here, the Plaintiff established by a preponderance of the evidence that Pace was insolvent at the time of the transfer of the condo. Under the TUFTA, a debtor will be presumed insolvent if he is not paying his debts as they become due. *See* Tex. Bus. & Com. Code § 24.003(b). The evidence showed that Pace was unable to pay his business debts as they came due, necessitating borrowing tens of thousands of dollars from Hensley beginning as early as October, 2005. Hensley did not present any evidence to rebut this presumption of insolvency. Furthermore, some courts have found that a debtor's insolvency at a particular time may be established through the process of retrojection, by "'showing that the debtor was insolvent a reasonable time … after the transfer and that the debtor's financial condition did not materially change during the intervening period.'" *Weaver v. Kellog*, 216 B.R. 563, 576 (S.D. Tex. 1997) (citation omitted). *See also In re Sullivan*, 161 B.R. 776, 784 (Bankr. N.D. Tex. 1993) (accepting evidence six months before and six months after the transaction in question in order to show insolvency at the time of the transaction). While Pace gave conflicting testimony regarding changes in his financial condition between the time of the transfer and the filing of his bankruptcy schedules (showing his insolvency), the fact remains that, at the time of the transfer, Pace was unable to pay his debts as they came due. Furthermore, the evidence was strong that both Pace and Chaparral were balance sheet insolvent at the time of the transfer (or were rendered insolvent by the transfer).

The elements for constructive fraud under section 24.006(a) are thus met.

Finally, constructive fraud can also be shown here under section 24.005(a)(2) of the TUFTA.[5] Section 24.005(a)(2) states:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made …, if the debtor made the transfer…:

(2) without receiving a reasonably equivalent value in exchange for the transfer …, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

---

[5] Although the Plaintiff did not specifically plead or address this section of the TUFTA in its papers or at the hearing, the court will nonetheless address this section as it is applicable to the facts of this case.

> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

The court has already determined, as discussed above, that Pace did not receive reasonably equivalent value for the transfer of the condo. Thus, the remaining question under section 24.005(a)(2) is whether Pace "was engaged or was about to engage in a business or a transaction for which the remaining assets of [Pace] were unreasonably small in relation to the business or transaction," or whether Pace "intended to incur, or believed or reasonably should have believed that [he] would incur, debts beyond [his] ability to pay as they became due."

The evidence presented at the trial satisfies the second prong of section 24.005(a)(2). The court finds that, at the time of the transfer, Pace believed, or at least reasonably should have believed, that he would incur debts beyond his ability to pay as they came due. First, Pace had been pouring money into his struggling businesses since at least October, 2005. While Pace testified that he did this to prevent the businesses from failing, at the time of the transfer in March, 2006, it was abundantly clear that at least DFICalrea was failing. Second, the court has already found that Hensley failed to rebut the presumption of Pace's insolvency at the time of the transfer under section 24.003(b) of the TUFTA. In light of Pace's evidenced intention to continue sinking money into his failing businesses, and Pace's presumed insolvency at the time of the transfer, the court concludes that, at the time of the transfer of the condo, Pace believed, or reasonably *should have believed*, that he would not be able to pay his debts as they became due. *See West*, 2008 Bankr. LEXIS 4060, at *87 (finding that "[b]ecause the Trustee has shown that [the debtor] was insolvent at the time of the transfers … [the debtor] should have reasonably believed that it could not pay its debts as they became due."); *see also SEC v. Res. Dev. Int'l LLC*, 487 F.3d at 301 (concluding, based on findings that the debtor had not received reasonably equivalent value and was insolvent at the time of the transfer, that the transfer "qualifie[d] as fraudulent under § 24.005(a)(2)").

### 2. Good Faith Defense under Section 24.009(a) of the TUFTA

Having concluded that the transfer of the condo constitutes a voidable fraudulent transfer under section 24.005(a)(1) of the TUFTA, the court must address the good faith defense that is available to a transferee under section 24.009.[6] The Defendants bore the burden of establishing

---

[6] Because the court has found that the transfer at issue is voidable under section 544, the good faith defense that is available under section 548(c) of the Bankruptcy Code, by its own terms, does not apply. But the good faith defense of section 24.009(a) of the TUFTA is essentially identical to section 548(c) with the exception that section 24.009(a) does not protect constructive fraudulent transfers. *See United States v. Evans*, 513 F. Supp. 2d 825, 836 (W.D. Tex. 2007) ("By its terms, the section 24.009(a) defense only applies to section 24.005(a)(1) TUFTA claims, not section 24.006(a) claims.").

this defense. *Smith v. Suarez (In re IFS Financial Corp.)*, 417 B.R. 419, 441 (Bankr. S.D. Tex. 2009); *see also SEC v. Cook*, 2001 U.S. Dist. LEXIS 2601, at *10 (N.D. Tex. Mar. 8, 2001) (section 24.009(a) requires that the transferee establish both good faith and reasonably equivalent value). Section 24.009 of the TUFTA states,

> (a) A transfer or obligation is not voidable under Section 24.005(a)(1) of this code against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

Tex. Bus. & Com. Code § 24.009(a). The court has already found that Pace/Chaparral did not receive reasonably equivalent value for the transfer of the condo. "The 'good faith' prong of this defense must be analyzed under an objective, rather than a subjective, standard. The relevant inquiry is what the transferee 'objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint.'" *Quilling v. Stark*, 2007 U.S. Dist. LEXIS 8695, at *11 (S.D. Tex. Feb. 7, 2007) (citation omitted). Additionally, "[o]ne lacks the good faith that is essential to the [TUFTA] defense to avoidability if possessed of enough knowledge of the actual facts to induce a reasonable person to inquire further about the transaction." *SEC v. Cook*, 2001 U.S. Dist. LEXIS 2601, at *11. As recently articulated by the district court for the Northern District of Texas,

> A 'transferee who takes property with knowledge of such facts as would excite the suspicions of a person of ordinary prudence and put him on inquiry of the fraudulent nature of an alleged transfer does not take the property in good faith and is not a bona fide purchaser.' … Further, 'notice of fraudulent intent can be either actual or constructive.' Texas courts hold that 'actual notice results from personal information or knowledge,' whereas constructive notice results from notice that 'the law imputes to a person not having personal information or knowledge.'

*GE Capital Commer., Inc. v. Wright & Wright, Inc.*, 2011 U.S. Dist. LEXIS 3962, at *16-17 (N.D. Tex. Jan. 13, 2011). Finally, "[t]he Fifth Circuit has implied that knowledge of the debtor's insolvency at the time the transfer was received may be sufficient to preclude a finding of 'good faith.'" *Smith*, 417 B.R. at 442 (citing *Swaggart Ministries v. Hayes (In re Hannover)*, 310 F.3d 796, 799-801 (5th Cir. 2002)). Hensley was Pace's closest friend and his long-time attorney. He prepared the deed for the transfer. He knew that, at that point in time, no actual consideration had even been settled on -- and in all likelihood had not even been contemplated. Hensley knew just about everything there was to know about Pace's financial condition and business plans during the relevant time frame. From an objective standpoint, the court concludes that Hensley knew, or at the very least should have known, of the fraudulent nature of this transfer.

3.  Recovery of Fraudulent Transfer under Section 550 of the Bankruptcy Code

Having established that the transfer of the condo is voidable under section 544 of the Bankruptcy Code, the court must now determine whether the Plaintiff is entitled to recover the property at issue (or its value) from CFM, Hensley or both. "Section 550 [of the Bankruptcy Code] prescribes the rights and liabilities of a transferee of an avoided transfer, and authorizes the trustee to recover the property or value of the property transferred. As such, § 550 stands as a recovery statute rather than a primary avoidance basis for action, and provides an avenue of recovery for the trustee who prevails under an avoidance section of the Code." *Southmark Corp. v. Schulte, Roth & Zabel, L.L.P.*, 242 B.R. 330, 337 (N. D. Tex. 1999). Section 550 of the Bankruptcy Code provides that,

> to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a). The Plaintiff's power to recover property under section 550(a) is limited by section 550(b),

> which prevents recovery from immediate or mediate transferees of the initial transferee under § 550(a)(2) who 'take[] for value . . . , in good faith, and without knowledge of the voidability of the transfer avoided.' 11 U.S.C. § 550(b)(1). No such good faith defense is available to the initial transferee or the 'entity for whose benefit such transfer was made' under § 550(a)(1); the trustee may always recover from the initial transferee regardless of good faith, value, or lack of knowledge of the voidability of the transfer.

*Rupp v. Markgraf*, 95 F.3d 936 (10th Cir. 1996); *see also Cullen Ctr. Bank & Trust v. Hensley (In re Criswell)*, 1997 U.S. App. LEXIS 12784, at *30 (5th Cir. 1997) (noting that initial transferees cannot assert protection under the good faith transferee for value clause which is reserved for subsequent transferees only under § 550(b)"). Here, CFM is clearly an initial transferee, so the Plaintiff may recover the condo (or its value) from CFM pursuant to section 550(a). The court has discretion in determining whether to award the Plaintiff the property itself or the value of the property. *In re Mega Sys., LLC*, 2007 Bankr. LEXIS 1957, at *25 (Bankr. E.D. Tex. June 4, 2007). "The factors which the Court should consider in determining whether to order turnover of the property rather than payment of the value include whether the value of the property (1) is

21

contested; (2) is not readily determinable; or (3) is not diminished by conversion or depreciation." *Id*.

A larger question arises over whether to hold Hensley jointly and severally liable with CFM as either an "initial transferee" (under an alter-ego theory of liability) or as "the entity for whose benefit such transfer was made" under section 550. In *Schechter v. 5841 Bldg. Corp. (In re Hansen)*, the bankruptcy court for the Northern District of Illinois addressed the question of whether the president and majority shareholder of a corporation could be considered an "initial transferee" of transfers made to the corporation by virtue of his control over the corporation. 341 B.R. 638, 641 (Bankr. N.D. Ill. 2006). The court first found that the corporation to whom the debtor had actually made the payments at issue was the "initial transferee" because it "was the first to receive the payments and had dominion over them – the right to use the funds as it pleased." *Id*. The court then discussed whether the president/shareholder could also be considered an initial transferee by virtue of ownership and management of the company:

> One could [argue that the president/shareholder was the initial transferee based on his ownership and management], but the argument would go nowhere. To go somewhere, [the plaintiff] would have to adduce evidence that [the corporation] was actually [the president's] alter ego, making [the president] the 'initial transferee' of the payments. Several courts, including this one, have acknowledged or assumed the viability of such a theory. *See, e.g., Peterson v. Hofmann (In re Delta Phones, Inc.),* 2005 Bankr. LEXIS 2550, Nos. 04 B 823, 05 A 1205, 2005 WL 3542667, at *7 (Bankr. N.D. Ill. Dec. 23, 2005) (permitting trustee to amend complaint to allege alter ego claim against members of limited liability company); *Cuthill v. Kime (In re Evergreen Sec., Ltd.),* 319 B.R. 245, 255-56 (Bankr. M.D. Fla. 2003) (assuming viability of theory but finding a failure of proof); *Carolyn's Kitchen v. Cybergenics Corp. (In re Carolyn's Kitchen),* 209 B.R. 204, 209 (Bankr. N.D. Tex. 1997) (same).No evidence in the record suggests that [the corporation] was [the president's] alter ego, and [the plaintiff] points to none. [The plaintiff] notes that [the president] was president and majority shareholder of [the corporation], but that is not remotely enough. A corporation is an entity distinct from its shareholders, directors, and officers. *In re Rehabilitation of Centaur Ins. Co.,* 158 Ill. 2d 166, 172, 632 N.E.2d 1015, 1017, 198 Ill. Dec. 404 (1994). To ignore a corporation's existence -- a drastic step -- there must be both (1) such a unity of interest and ownership that the separate personalities of person and corporation no longer exist, and (2) circumstances under which adherence to the fiction of corporate separateness would promote injustice or inequity. *International Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.,* 356 F.

> 3d 731, 736 (7th Cir. 2004). No evidence here raises an inference of either one. As far as the record is concerned, [the corporation] and [the president] were separate entities.

*Id*. at 643-44. *See also In re Klein*, 1991 Bankr. LEXIS 1672, at *108-109 (Bankr. N.D. Ill. June 20, 1991) (concluding that certain transfers made to an entity that was controlled by the defendants, such that the defendants and the entity were essentially one and the same, could be recovered from the defendants as "initial transferees" under section 550).

In Texas, the corporate veil may be pierced to hold an individual shareholder liable in three broad situations: where "(1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate a fraud." *Rimade Ltd. v. Hubbard Enters.*, 388 F.3d 138, 143 (5th Cir. 2004).[7] Here, the facts presented at the hearing showed that Hensley solely controlled the operation and management of CFM. Hensley also commingled CFM funds in his general cash management account. This evidence is probably insufficient to pierce the corporate veil under an alter-ego theory of liability. In examining whether a corporation is merely the alter-ego of its shareholder, courts

> look[] to the total dealings between the corporation and the individual, including the degree to which corporate formalities have been maintained, whether corporate and individual assets have been kept separately, the financial interests, ownership, and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes.

*In re JNS Aviation*, 376 B.R. at 528. The parties simply did not present enough evidence regarding how Hensley used and managed CFM for the court to make an alter-ego determination here. Nonetheless, the Plaintiff did establish that Hensley used CFM to perpetrate a fraud. The court in *JNS Aviation*, discussing Fifth Circuit precedent, addressed this third prong of corporate veil piercing as being essentially equitable in nature:

> 'for the first time, the focus of veil-piercing analysis is on some inequitable result for the *claimant*, because of abuses of the corporate form.' [] 'This category allows a corporate disregard in a much broader range of cases than those strictly speaking of fraud…' Neither intentional fraud nor intent to defraud need be shown to satisfy this strand. The sham strand is the catchall and broadest form of piercing. Looking to *Castleberry*, the Fifth Circuit stated as follows:

---

[7] Texas corporate veil piercing law is equally applicable in the context of limited liability companies. *Nick Corp. v. JNS Aviation, Inc. (In re JNS Aviation, Inc.)*, 376 B.R. 500, 526 (Bankr. N.D. Tex. 2007).

> The [*Castleberry*] court emphasized that this standard for corporate disregard is whether honoring legal independence would result in 'inequity' or 'injustice'; the purpose 'is to prevent use of the corporate entity as a cloak for fraud or illegality or to work an injustice, and that purpose should not be thwarted by adherence to any particular theory of liability.'

*In re JNS Aviation*, 376 B.R. at 528-29 (quoting *Gibraltar Savings v. LD Brinkman Corp.*, 860 F. 2d 1275, 1289 (5th Cir. 1988)) (internal citations omitted).

The court's previous findings and conclusion that Hensley did not act in good faith in connection with the transfer of the condo underscores the conclusion here that Hensley used CFM to help Pace carry out a fraudulent transfer. That evidence is sufficient to justify piercing the corporate veil and to thus recover the condo from both Hensley and CFM under the theory of joint and several liability. *See Resource Dev. Int'l, LLC*, 587 F.3d at 303 (affirming district court's conclusion that defendant shareholder had "utilized his control over defendant corporation" to perpetuate the debtor's fraudulent conduct where defendant had agreed with debtor to pay debtor's legal fees in exchange for a wire transfer to defendant's corporation, and holding defendant and defendant's corporation jointly and severally liable under section 550).[8]

As a final note, Hensley and CFM are precluded from taking advantage of the provisions of section 550(e). Section 550(e) states that "[a] good faith transferee from whom the trustee may recover under subsection (a) of this section has a lien on the property recovered to secure the lesser of—(A) the costs, to such transferee, of any improvement made after the transfer, less the amount of any profit realized by or accruing to such transferee from such property[.]" 11 U.S.C. § 550(e). The court has already found that Hensley did not act in good faith. Thus, the protections of section 550(e) are not available to him. *See Meoli v. Huntington Nat'l Bank (In re Teleservices Group, Inc.)*, 2011 Bankr. LEXIS 949, at *124 (Bankr. W.D. Mich. Mar. 17, 2011)

---

[8] The Plaintiff also argued that Hensley should be held personally liable as the person "for whose benefit the transfer was made." In light of the court's conclusion that he can be held liable as an "initial transferee" under a veil piercing theory of liability, the court need not reach this issue. Nonetheless, the court notes that the Hensley could also be held personally liable under this theory. *See Schechter v. 5841 Bldg. Corp. (In re Hansen)*, 341 B.R. 638, 645 (Bankr. N.D. Ill. 2006) (stating that "shareholders, officers, and directors are not liable for transfers to their corporation unless they actually received distributions of the transferred property (in which case they would be subsequent transferees under section 550(a)(2)), or a showing can be made to *pierce the corporate veil*," and further noting that "[m]ost cases in which shareholders or officers have been found responsible under section 550(a)(1) as beneficiaries of corporate transfers have involved some veil-piercing aspect") (emphasis added). *See also Tavormina v. Weiss (In re Behr Contracting, Inc.)*, 79 B.R. 84, 87 (Bankr. S.D. Fla. 1987) (finding sole shareholder of corporate transferee liable as transfer beneficiary where corporation had "no assets or liabilities" and so was a mere shell); *Jacoway v. Anderson (In re Ozark Rest. Equip Co.*, 74 B.R. 139, 145 (Bankr. W.D. Ark.) (finding liability where corporate transferees "were utilized as the defendants' mere instrumentalities"), *aff'd in part*, 77 B.R. 686 (W.D. Ark. 1987), *aff'd in part, rev'd in part*, 850 F.2d 342 (8th Cir. 1988).

("A bad faith recipient is never entitled to the compensatory lien that Section 550(e) otherwise
provides to all transferees. Put simply … a recipient of an actually fraudulent transfer who
himself is aware of the fraud (i.e. in bad faith) is no less reprehensible than the fraudulent debtor
himself. Nor is such transferee any more deserving of the Code's protections whether offered
under Section 550 or otherwise.").

    4.   <u>Breach of Fiduciary Duty – Rule 1.08 of the Texas Disciplinary Rules of Professional
Conduct</u>

       The Plaintiff also contended that Hensley was liable to the estate for breach of fiduciary
duty, growing out of his violation of the disciplinary rules of professional conduct for lawyers,
by entering into a business transaction without his client's having the benefit of independent
counsel to advise him, and without a written consent from the client.

       Hensley argued that the Plaintiff's breach of fiduciary duty claim was barred by state
statute of limitations for breach of fiduciary duty claims. In Texas, breach of fiduciary duty
claims must be brought within 4 years after the cause of action accrues. Tex. Civ. Prac. & Rem.
Code § 16.004. "'[A] cause of action accrues when a wrongful act causes some legal injury.'"
*USPPS, Ltd. v. Avery Dennison Corp.*, 2010 U.S. Dist. LEXIS 84450, at *35 (W.D. Tex. Mar. 18,
2010) (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)). Section 108 of the Bankruptcy Code
describes the applicability of state statutes of limitation to actions brought by the trustee on
behalf of the debtor.  "By its express language, § 108(a) only applies to causes of action that the
debtor owned prepetition." *In re Topcor, Inc.*, 132 B.R. 119, 126 (Bankr. N.D. Tex. 1991); *see
also In re Princeton-New York Investors, Inc.*, 219 B.R. 55, 58 (D.N.J. 1998) (same). Section 108
provides:

    (a) If applicable nonbankruptcy law ... fixes a period within which the debtor may
    commence an action, and such period has not expired before the date of the filing
    of the petition, the trustee may commence such action only before the later of--

        (1) the end of such period …; or

        (2) two years after the order for relief.

11 U.S.C. sec. 108(a). The court will assume the cause of action for breach of fiduciary duty accrued on March 10, 2006, when Pace transferred the property to Hensley/CFM.[9] Pace filed for bankruptcy on August 15, 2007, well within the four year statute of limitations. The Plaintiff filed its original complaint on July 21, 2009, and its second amended complaint (which included, for the first time, the breach of fiduciary duty claim) on August 27, 2010. The second amended complaint was filed both after the state statute of limitations had expired and after two years after the order for relief. So this claim is time-barred unless it relates back to the date of the original complaint (which falls within the time period prescribed by section 108).

For the Plaintiff to establish that its second amended complaint relates back to the original complaint, the Plaintiff must satisfy the elements of Rule 15(c)(1)(A)-(B) of the Federal Rules of Civil Procedure. That rule states, "[a]n amendment to a pleading relates back to the date of the original pleading when: (A) the law that provides the applicable statute of limitations allows relation back; [or] (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading." Fed. R. Civ. P. 15. *See also Sanders-Burns v. City of Plano*, 594 F.3d 366, 373 (5th Cir. 2010). Furthermore, "'[t]he fact that an amendment changes the legal theory on which the action initially was brought is of no consequence if the factual situation upon which the action depends remains the same and has been brought to defendant's attention by the original pleading.'" *Federal Deposit Ins. Corp. v. Bennett*, 898 F.2d 477, 480 (5th Cir. 1990) (citation omitted). The underlying transaction as set forth in the Plaintiffs' original complaint is the same underlying transaction that forms the basis of the Plaintiff's breach of fiduciary duty claim. The facts necessary to the Plaintiff's breach of fiduciary claim were laid out in the Plaintiff's original complaint. Therefore, the Plaintiff's breach of fiduciary duty claim relates back to the original timely-filed complaint and is not time-barred.

Regarding the merits of the Plaintiff's breach of fiduciary duty claim, the Plaintiff argued that Hensley breached his fiduciary duty to Pace and Chaparral by entering into a business transaction with Pace/Chaparral in violation of Rule 1.08 of the Texas Disciplinary Rules of Professional Conduct. Under Texas law, a fiduciary relationship exists between an attorney and client. *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988). Furthermore, while the violation of a disciplinary rule of professional conduct does not itself create a private cause of action, "Texas courts have used the Rules as standards for conduct in malpractice and breach of fiduciary duty

---

[9] The Plaintiff argued that, under the discovery rule, the action did not accrue until the trustee was appointed. Courts have applied the discovery rule to toll statutes of limitation in bankruptcy cases until a trustee is appointed, *see Seitz v. Detweiler, Hershey & Assocs., P.C. (In re CitX Corp.)*, 2004 U.S. Dist. LEXIS 24903, at *11-12 (E.D. Pa. Dec. 8, 2004) (applying discovery rule to toll the statute of limitations on professional malpractice claim until trustee was appointed). The court need not rely on the discovery rule here, however, because the court concludes that the Plaintiff's second amended complaint relates back to the original, timely-filed complaint under Rule 15(c) of the Federal Rules of Civil Procedure.

cases." *Frazin v. Haynes & Boone, LLP (In re Frazin)*, 2008 Bankr. LEXIS 2373, at *198 (Bankr. N.D. Tex. Sept. 23, 2008); *see also Sealed Party v. Sealed Party*, 2006 U.S. Dist. LEXIS 28392, at *31 (S.D. Tex. May 4, 2006) (stating that Texas Disciplinary Rules "may be considered evidence and significantly inform the analysis of the scope of fiduciary duties between attorneys and their clients").

> Rule 1.08 states that,
>
> (a) A lawyer shall not enter into a business transaction with a client unless:(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed in a manner which can be reasonably understood by the client;(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and(3) the client consents in writing thereto.

Tex. Disciplinary R. Prof'l Conduct 1.08. Courts "review all business dealings between a lawyer and a client using the strict scrutiny standard." *MacFarlane v. Nelson*, 2005 Tex. App. LEXIS 7681, at *27-28 (Tex. App.—Austin [3d Dist.] Sept. 15, 2005, pet. denied.). It is undisputed that Hensley was Pace and Chaparral's attorney at the time of the transaction and that Hensley controlled the purchaser of Pace's condo (CMF). That CFM, rather than Hensley, was the named party to the transaction and the direct recipient of the condo does not preclude a finding that Hensley nonetheless violated Rule 1.08. *See Rosas v. Comm'n for Lawyer Discipline*, 2010 WL 4488273 (Tex. App.—San Antonio, Nov. 10, 2010) (finding attorney who had engaged in transaction with client whereby client transferred property to the attorney's company had violated Rule 1.08).

The Plaintiff argued that Hensley violated all three prongs of Rule 1.08. First, it is clear that the terms of the alleged agreement Pace and Hensley purportedly reached in November, 2005, were far from clear. Both parties presented conflicting testimony regarding whether the transfer of the condo was in exchange for forgiveness of attorneys fees owed, for funds loaned, or both. Regarding the second prong of Rule 1.08, the Texas rule, unlike the Model Rule,[10] does not require that the attorney advise the client in writing of the desirability of seeking the advice of independent counsel. The Texas rule merely requires that the client be given a reasonable opportunity to seek such independent advice. *See* Tex. Disciplinary R. Prof'l Conduct 1.08. Based on the evidence presented at the trial, the court is unable to find that Pace was not given such an opportunity. If their testimony is to be believed, Pace and Hensley first began discussing

---

[10] *See* Rule 1.8 of the Model Rules of Professional Responsibility at http://www.americanbar.org/groups/ professional_responsibility/publications/model_rules_of_professional_conduct/ rule_1_8_current_clients_specific_rules.html.

this transaction in November, 2005, but the transfer did not actually take place until several months later. Pace was represented by other attorneys during that time and could have sought independent counsel if he had wanted to.

Finally, the evidence showed that Pace did not sign any writing consenting to the transaction with his attorney. Hensley and Pace both maintained that signing the deed was sufficient to establish consent for purposes of Rule 1.08. The court disagrees. If signing the transaction papers was sufficient to satisfy the consent requirement of Rule 1.08, that requirement would lose all meaning. Other courts have also required that the writing consenting to a transaction with one's attorney be separate from the transaction papers themselves. *See, e.g., Tai v. Charfoos (In re Charfoos)*, 183 B.R. 131, 136-37 (Bankr. E.D. Mich. 1994) (applying Michgan's identical Rule 1.8); *In re Estate of Brown*, 930 A.2d 249, 254 (D.C. 2007) (applying nearly identical Rule 1.8 and stating that "'the client's signature on documents evidencing the business transaction cannot be considered 'written consent' under the rule where the client has not been informed of the implications … of the transaction") (quoting *In re Taylor*, 741 N.E.2d 1239, 1242 (Ind. 2001)). *See also Johnson v. Williams*, 2006 Tex. App. LEXIS 5180, 20-21 (Tex. App. Houston 1st Dist. June 15, 2006) (interpreting Rule 1.08 as "stating that an attorney must obtain written consent prior to entering a business transaction with a client").

In short, the Plaintiff presented sufficient facts to establish that Hensley violated Rule 1.08. Such violation must still constitute a breach of fiduciary duty, however, in order to be actionable. "Under Texas law, the elements of a breach of fiduciary duty claim are: (1) the plaintiff and defendant had a fiduciary relationship; (2) the defendant breached its fiduciary duty to the plaintiffs; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant." *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 669 (S.D. Tex. 2010) (citing *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007)); *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The first two elements have been satisfied here. Regarding harm to Pace, however, in breach of fiduciary duty cases "the client carries the burden to establish that the attorney's breach caused him damage." *MacFarlane v. Nelson*, 2005 Tex. App. LEXIS 7681, at *30. Here, the Plaintiff, having stepped into the shoes of Pace, and having properly asserted a claim for breach of fiduciary duties owed to Pace, has not established (and indeed did not argue the existence of) any harm to Pace other than the loss of the condo. Because the court has already concluded that the transfer of the condo may be avoided under section 544 of the Bankruptcy Code, and that the condo (or its value) may be recovered from CFM and Hensley under section 550, the court will not award further damages for Hensley's breach of his fiduciary duty to Pace. However, the court will conclude that the loss of the condo counts as damages for breach of fiduciary duty, forming an independent basis for recovery on the part of the Plaintiff.

5. Exemplary Damages and Attorneys' Fees

"There is no specific Bankruptcy Code provision allowing a court to grant exemplary damages against the transferor or transferee of a fraudulent transfer." *Anderson v. Mega Sys., L.L.C. (In re Mega Sys., L.L.C.)*, 2007 Bankr. LEXIS 1957, at *26 (Bankr. E.D. Tex. June 4, 2007) (citing *Smith v. Lounsbury (In re Amberjack Interests, Inc.)*, 326 B.R. 379, 392 (Bankr. S.D. Tex. 2005)). Nonetheless, "[a] bankruptcy court may rely on state law to award exemplary damages where the Code does not specifically allow such measures. Texas law provides for an award of exemplary damages only on a showing of fraud or malice by clear and convincing evidence." *Id*. at *27 (citing Tex. Civ. Prac. & Rem. Code § 41.003(a)-(b)).[11] Here, the Plaintiff's claims only required proof by a preponderance of the evidence. *See Ingalls*, 421 B.R. at 279 (citing *Walker v. Anderson,* 232 S.W.3d 899, 913 (Tex. App.--Dallas 2007, no pet.)). Additionally, a court "is always free to decline to award exemplary damages, as such an award is within the discretion of the fact-finder." *Anderson*, 2007 Bankr. LEXIS 1957, at *27 (citing Tex. Civ. Prac. & Rem. Code § 41.010(b)).

The court declines to award exemplary damages in this case. While the Plaintiff's evidence was sufficient to establish, by a preponderance of the evidence, that the transfer of the condo constituted a fraudulent transfer under the TUFTA, the evidence did not establish, by *clear and convincing evidence*, that Hensley acted fraudulently, or with gross negligence or malice.

Regarding the Plaintiff's request for attorneys' fees and costs, "[s]ection 24.013 [of the TUFTA] allows this Court to award 'costs and reasonable attorney's fees as are equitable and just.'" *West v. Seiffert (In re Houston Drywall, Inc.)*, 2008 Bankr. LEXIS 4060, at *92-93 (Bankr. S.D. Tex. July 10, 2008) (citing Tex. Bus. & Com. Code § 24.013 (Vernon 2006) and *Walker v. Anderson*, 232 S.W.3d 899, 919 (Tex. App.--Dallas 2007, no pet.)); *see also Suarez v. Smith (In re IFS Fin. Corp.)*, 2010 U.S. Dist. LEXIS 48670, at *8 (S.D. Tex. 2010) ([Section 24.013] of TUFTA gives the trial court the sound discretion to award attorney's fees based on the evidence . . ."). In *West*, the bankruptcy court for the Southern District of Texas awarded attorneys' fees to the trustee under section 24.031 after finding that the defendants had "defrauded the creditors of [the debtor's] bankruptcy estate by surreptitiously taking assignments of [certain] receivables for no consideration." 2008 Bankr. LEXIS 4060, at *93. The court found that "[g]iven this egregious conduct … it [was] equitable and just to award attorney's fees and

---

[11] Section 41.003 of the Civil Practice and Remedies Code also applies to breach of fiduciary duty claims brought under Texas law. *See Joe N. Pratt Ins. v. Doane*, 2010 U.S. Dist. LEXIS 14986 (S.D. Tex. Feb. 19, 2010) (finding that, under section 41.003, plaintiff had to establish that damages for breach of fiduciary duty resulted from fraud, malice or gross negligence to be entitled to an award of exemplary damages).

costs to the Trustee for his prosecution of this adversary proceeding." No such egregious conduct exists here. Hensley did provide consideration for the transfer (albeit not "reasonably equivalent" consideration). Additionally, neither party tried to conceal the transfer from Pace's creditors. Nonetheless, courts also appear to award reasonable attorneys' fees to the prevailing party in fraudulent transfer actions under the TUFTA regardless of whether the conduct at issue was egregious. *See, e.g., Tow v. Pajooh (In re CRCGP LLC)*, 2008 Bankr. LEXIS 4236, at *61-62 (Bankr. S.D. Tex. Aug. 28, 2008); *Quilling v. 3D Mktg., LLC*, 2007 U.S. Dist. LEXIS 24914, at *11 (N.D. Tex. 2007) ("As the prevailing party in the case [under the TUFTA], the Receiver is entitled to recover 'costs and reasonable attorney's fees as are equitable and just.' An application for attorney's fees shall be filed within 14 days after entry of a final judgment…") (citing Tex. Bus. & Com. Code § 24.013)). The Plaintiff is directed to submit a fee request in accordance with the local rules.

Finally, regarding the Plaintiff's request for pre-judgment interest, courts within the Fifth Circuit have held that prejudgment interest is available on a recovery under section 544:

> Federal law governs the allowance of prejudgment interest when a cause of action arises from a federal statute. *In re Texas Gen. Petroleum Corp.*, 52 F.3d 1330, 1339 (5th Cir. 1995) (citing *Carpenters Dist. Council v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1288 (5th Cir. 1994)). The Fifth Circuit applies a two-step analysis to determine whether an award of prejudgment interest is within a court's discretion: (1) whether the federal act that creates the cause of action precludes such an award; and (2) whether such an award furthers the congressional policies of the federal act. *Id.* Applying this analysis to Bankruptcy Code § 548, the Fifth Circuit has held that The Bankruptcy Code and particularly § 548 are silent with regard to prejudgment interest. . . . Furthermore, an award of prejudgment interest furthers the congressional policies of the Bankruptcy Code. . . . The purpose of [Section 548] is to make the estate whole. Prejudgment interest compensates the estate for the time it was without use of the transferred funds. *Id*. at 1339-40. [Plaintiff] brings its fraudulent transfer claim under § 544 of the Bankruptcy Code, and the Court finds that this analysis applies to this section, as well.

*Asarco LLC v. Ams. Mining Corp.*, 404 B.R. 150, 163 (S.D. Tex. 2009). Thus, the Plaintiff is entitled to recover prejudgment interest on its section 544 claims. Regarding the proper rate of prejudgment interest, "[a]bsent a federal statute on the matter, state law is an appropriate source of guidance on the proper prejudgment interest rate." *Anderson*, 2007 Bankr. LEXIS 1957, at *28 (citation omitted). "Texas state law utilizes the same rate for both pre- and post-judgment interest, generally utilizing the prime rate as published by the Board of Governors of the Federal

Reserve System on the fifteenth day of the month preceding the month of the judgment." *Anderson*, 2007 Bankr. LEXIS 1957, at *29 (citing Tex. Fin. Code §§ 304.003 and 304.103 (Vernon 2006)).

# # #